2023 PA Super 31

| | |
|---|---|
| GEORGE ROGERS, ADMINISTRATOR OF THE ESTATE OF JOSHUA ROGERS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| LLOYD THOMAS, HAYDEN THOMAS AND/OR THE OUTDOORSMAN INC. | |
| | No. 1915 MDA 2018 |

Appeal from the Judgment Entered November 21, 2018
In the Court of Common Pleas of Susquehanna County
Civil Division at No.: 2016-1244

| | |
|---|---|
| SUZETTE BENET, ADMINISTRATOR OF THE ESTATE OF GILBERTO ALVAREZ | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| LLOYD THOMAS, HAYDEN THOMAS AND/OR THE OUTDOORSMAN INC. | |
| | No. 1916 MDA 2018 |

Appeal from the Judgment Entered November 21, 2018
In the Court of Common Pleas of Susquehanna County
Civil Division at No.: 2016-00869

BEFORE: PANELLA, P.J., BENDER, P.J.E., BOWES, OLSON, STABILE, KUNSELMAN, NICHOLS, KING and McCAFFERY, JJ.

OPINION BY STABILE, J.:                    **FILED: MARCH 2, 2023**

Appellants George Rogers, Administrator of the Estate of Joshua Rogers

(the "Rogers Estate"), and Suzette Benet, Administrator of the Estate of

Gilberto Alvarez (the "Alvarez Estate"), appeal from the November 21, 2018 judgments entered against them in the Court of Common Pleas of Susquehanna County ("trial court") following a multi-day jury trial in these wrongful death and survival actions. Upon review, we affirm.

## I. BACKGROUND FACTS[1]

On February 11, 2012, Lloyd Thomas ("Lloyd") shot and killed Joshua Rogers ("Rogers") and Gilberto Alvarez ("Alvarez") (collectively "Decedents") while Decedents were on a property owed by Lloyd's father, Hayden Thomas ("Hayden"). Lloyd subsequently was arrested and charged with the voluntary manslaughter of Rogers and Alvarez; a jury found him guilty in January 2014. On March 3, 2014, Lloyd was sentenced to an aggregate term of 6 to 12 years in prison, followed by 8 years' probation.

At the time of the killing, Hayden was the owner and sole occupant of a home located at 114 Pine Ayers Road, Hallstead, Pennsylvania. Hayden was 79 years old at the time of Lloyd's trial and had resided in the home for 50 years. The home was located in a somewhat remote location accessible only by crossing a narrow wooden bridge and then driving up a winding gravel road. Hayden operated a small gun shop called The Outdoorsman Inc. ("Outdoorsman") from a room attached to his home. On the day of Rogers'

---

[1] We recite these general background facts based upon our review of the trial record, subject to the standards of review applicable to each of the issues raised by Appellants.

and Alvarez' killing, Hayden was not at home and asked his son Lloyd to watch his dog.

Lloyd went to Hayden's home the day before this incident and installed a new birdfeeder. The following morning, he noticed squirrels had damaged the birdfeeder. He took his pistol and began shooting at squirrels. At about this time, Rogers was driving a Mustang along a road near Hayden's home with Alvarez as his passenger. They returned to their home complaining someone had shot their car. They were aggravated, upset, and stated that they were going to find the person who shot at the car and make them pay for damages. They did not call the police.

Upon returning to their homes, both Rogers and Alvarez retrieved camouflaged coats and secured firearms. At the time, Rogers was prohibited from owning or having access to firearms. At Lloyd's criminal trial, a witness testified that on the day of the shooting incident he saw a black Mustang turn onto Pine Ayers Road, cross the bridge, and turn and park on the road. Two men exited the vehicle and the witness thought they were going to Hayden's home. Instead of going up the road, they proceeded through the woods. The route through the woods was up a steep bank. The vehicle was parked at the end of the driveway to effectively block anyone from driving up the road to Hayden's home. Another witness testified that on the day of this incident, a man knocked on her door and asked if she knew whether anyone was shooting. She responded there was a gun shop on the hill and they might be practicing or sighting guns. The witness stated that the person at the door

said someone shot at his vehicle, he was looking to see who it was, and it appeared he was trying to track down the shooter.

Lloyd testified that on the morning of February 11, 2012, he was at his father's (Hayden) property to watch his father's dog. Lloyd said he was in the garage when he heard the dogs bark.[2] He observed two men split up and surround the house. He did not view this as normal. He went into the house and saw Rogers under the deck. Rogers shoved a shotgun in Lloyd's face and Lloyd was scared for his life. He then shot Rogers two times. Lloyd then encountered Alvarez on the other side of the home. Lloyd saw him leaving the garage and thought he was in the garage trying to get into the gun shop. When Alvarez came out of the gun shop, he walked past Lloyd, whereupon Lloyd yelled to him, but Alvarez was walking quickly and showed no fear. Lloyd stated he shot Alvarez because he had a shotgun shoved in his face 30 seconds before, he was scared for his life, and believed he still was under a threat from his encounter with Rogers.[3]

On March 5, 2012, the Rogers Estate filed a wrongful death and survival action in the Court of Common Pleas of Lackawanna County against Lloyd,

---

[2] The record is not clear whether there was a single dog or multiple dogs to be watched.

[3] It appears from the record that at the time of the shooting, only Rogers carried a firearm, as Alvarez left his firearm in the vehicle. N.T., Sentencing, 3/3/14, at 67.

Hayden, and the Outdoorsman. Following Lloyd's criminal conviction,[4] the Rogers Estate moved for partial summary judgment against Lloyd. The trial court entered partial summary judgment against Lloyd and explained that by finding Lloyd guilty of voluntary manslaughter, the jury had found beyond a reasonable doubt that Lloyd had committed an intentional and unjustified killing—that is, Lloyd did not act in justifiable self-defense. The trial court thus found that the principles of collateral estoppel were applicable and barred Lloyd from relitigating intent in the Rogers civil action.

On February 10, 2014, the Alvarez Estate filed its wrongful death and survival action against Lloyd, Hayden, and the Outdoorsman in the Court of Common Pleas of Luzerne County, which sustained a preliminary objection to venue and consequently transferred the case to Susquehanna County. This Court affirmed the transfer on interlocutory appeal.[5] Subsequently, the Lackawanna County Court of Common Pleas coordinated the Rogers Estate case with the Alvarez Estate case and directed further proceedings to take place in Susquehanna County. The Court of Common Pleas of Susquehanna County then consolidated the cases.

The trial court granted in part Appellants' pre-trial motion to preclude evidence of Decedents' alleged violent propensities, criminal records,

---

[4] **Commonwealth v. Thomas**, 125 A.3d 436 (Pa. Super. filed July 6, 2015) (unpublished memorandum).

[5] **Benet v. Thomas**, 131 A.3d 85 (Pa. Super. filed August 7, 2015) (unpublished memorandum).

protection from abuse records, and prior vehicle violations. The trial court, however, refused to preclude evidence that Decedents were trespassers on Hayden's property, had firearms in their possession at the time of the shooting, and that they had parked their vehicle in Hayden's driveway. The trial court further declined to preclude evidence relating to Decedents' chronic drug use. It also denied Appellants' motion to preclude Lloyd from asserting a defense of comparative negligence, an affirmative defense that had not been available in Lloyd's criminal trial. Additionally, the trial court granted a motion to quash Appellants' subpoena for John Michael Shovlin, M.D., a friend and neighbor of Hayden who happened to be a psychiatrist, and his wife Lori Shovlin to testify at trial as fact witnesses.

The case proceeded to a nine-day jury trial, at which several witnesses testified about Lloyd's actions in the years and months leading up to the shooting and whether Hayden knew that Lloyd had exhibited any concerning behavior. One such witness, Jeffrey Gunn, testified about an incident in 2008 or 2009 in which a vehicle driven by Lloyd almost hit Gunn's vehicle. Gunn stated he initially followed Lloyd, but then stopped, at which point Lloyd stopped his car, got out, and pulled out a gun. Gunn testified that Lloyd "just stood there looking at me," and after "[Gunn] identified [him]self and his passenger . . . [Lloyd] got back in his truck and he left." N.T., Trial, 4/16/18, at 178. Gunn testified that Hayden was not present during the incident. *Id.* at 182. A friend of Hayden's, John Touch, testified that Lloyd changed after some events in his life, such as a fire at a previous location of the

Outdoorsman and a tree falling on his car. *Id.* at 190. He testified that Lloyd became scared and paranoid, and said that he spoke with Hayden about Lloyd's behavior. *Id.* at 190, 198.

Another witness, Kathryn Chesnick, testified that she called the police in January 2012 after she ran past Lloyd and saw him acting aggressively and cursing. *Id.* at 212. She told the police that Lloyd was "off his rocker," not acting like himself, and she was afraid he would kill himself or someone else. *Id.* One other person, Brian Griffis, testified that Lloyd removed a flag from Griffis' porch, threw it on the ground, and jumped on it. *Id.* at 245. However, he said he did not speak to Hayden about the incident. *Id.* at 259. Appellants also presented evidence that Lloyd used marijuana and that he previously had entered a mental health or rehabilitation facility. N.T., Trial, 4/20/18, at 61, 133.

The jury also heard testimony about the ownership of the gun Lloyd used in the shooting and Lloyd's relationship with the Outdoorsman. Appellants presented testimony that an official report listed the gun as belonging to a third party, and not to either Lloyd or the Outdoorsman. According to the testimony, such would be the case if the Outdoorsman had the gun, because when a shop purchases a firearm, the listed owner does not change until the store sells the firearm to a customer. N.T., Trial, 4/19/18, at 129. Appellants also presented testimony that Lloyd signed and filed documents for the Outdoorsman and helped with the paperwork. N.T., Trial, 4/20/18, at 137-38. Appellees countered with testimony that the gun

belonged to Lloyd and that Lloyd did not work at the Outdoorsman at the time of the shootings. *Id.* at 153, 170.

Following the close of Appellants' evidence, Hayden and the Outdoorsman orally moved for compulsory nonsuits, which the trial court granted only as to Hayden. Eventually, a jury returned a verdict in favor of Lloyd and the Outdoorsman finding Decedents 100% comparatively negligent. Appellants timely filed post-trial motions, which essentially were deemed denied by operation of law because the trial court failed to dispose of them within 120 days as required under Pa.R.Civ.P. 227.4(1)(b).[6] These appeals followed.[7] Appellants and the trial court complied with Pa.R.A.P. 1925.

## II. ISSUES PRESENTED FOR REVIEW

On appeal, Appellants present the following issues for our review, which we have reordered for ease of disposition.

---

[6] Rule 227.4(1)(b) provides in relevant part:

> [T]he prothonotary shall, upon praecipe of a party enter judgment upon . . . the decision of a judge following a trial without jury if . . . one or more timely post-trial motions are filed and the court does not enter an order disposing of all motions within one hundred twenty days after the filing of the first motion. A judgment entered pursuant to this subparagraph shall be final as to all parties and all issues and shall not be subject to reconsideration[.]

Pa.R.Civ.P. 227.4(1)(b).

[7] Appellants filed a notice of appeal at each docket number, each listing both trial court docket numbers. Because there is a separate notice at each docket, we do not quash this appeal. *Commonwealth v. Johnson*, 236 A.3d 1141, 1147-48 (Pa. Super. 2020) (*en banc*).

1. Whether [Appellants] are entitled to a new trial when summary judgment was granted [as] to [Lloyd] and the trial court allowed the jury to determine if [Lloyd] was negligent?

2. Whether the trial court erred when it allowed the jury to hear and decide comparative negligence issues despite [Lloyd's] actions being found intentional and without justification beyond a reasonable doubt in the criminal case?

3. Whether nonsuit should have been denied [as to Hayden] when there was sufficient evidence of record to establish liability?

4. Whether the trial court erred when it allowed psychiatrist Shovlin to not appear and testify at [the] time of trial?

5. Whether the trial court erred when it allowed prior bad acts and alleged chronic drug use of [Decedents] to be introduced at [the] time of trial?

6. Whether the trial court erred when it refused to have proper questions included, allowed impermissible questions and did not have the proper order of the questions on the jury verdict slip?

7. Whether the trial court erred when it refused to give and/or included certain jury instructions?

8. Whether the trial court erred when not granting [Appellants'] directed verdict?

9. Whether this case, on remand, should be coordinated in Lackawanna County?

Appellants' Brief at 8 (unnecessary capitalization omitted). After a panel of this Court split on whether Appellants were entitled to a new trial, this Court certified this case for *en banc* review.

## III. DISCUSSION

## A. The Request for a New Trial as to All Defendants; The Impact of Lloyd's Criminal Conviction.[8]

Appellants first claim that the trial court erred in submitting the issue of Lloyd's liability to the jury because they had the right to rely upon liability already having been determined in these civil actions based upon Lloyd's criminal conviction for voluntary manslaughter. Appellants' Brief at 36, 37, 39. Appellants maintain that the decision of the Lackawanna County Court granting summary judgment[9] affirmed that Lloyd's criminal conviction for voluntary manslaughter conclusively established his "liability" in these civil actions under collateral estoppel and that they now are entitled to a new trial on the issue of damages alone.[10] *Id.* at 40. We disagree. Appellants employ

---

[8] "In reviewing an order to grant a new trial, our standard of review is limited to determining whether the trial court abused its discretion or committed an error of law." *Lykes v. Yates*, 77 A.3d 27, 30 (Pa. Super. 2013) (citations and alterations omitted).

[9] In point of fact, it was the Rogers Estate's motion for partial summary judgment that was decided by the Lackawanna County Court before these actions were consolidated and coordinated in Susquehanna County. For sake of convenience we may sometimes refer to this decision as the grant of "summary judgment."

[10] Although Appellants' statement of the question on this issue assigns error to the trial court for allowing the jury to consider whether Lloyd was "negligent," Appellants' argument makes clear that what they contend is that Lloyd's "liability" for the Decedents' harm should have been conclusively established in these civil actions based upon his criminal conviction, leaving only the question of damages. We have confirmed that this is the issue being presented and that this is the issue preserved for our review. *See* Brief for Appellants, *supra*; Plaintiff's Special Verdict Slip at ¶¶ 1, 6, 8, 9, and 10 (where Appellants request binding instructions on all issues pertaining to Lloyd's liability); Appellants' Concise Statement of Errors Complained of on Appeal at ¶¶ 8, 11, and 12; Pa.R.A.P. 302(a).

*(Footnote Continued Next Page)*

collateral estoppel too broadly to argue that Lloyd's criminal conviction conclusively established his liability in these civil actions.

Four elements are necessary to establish a cause of action in negligence: a duty or obligation recognized by law; breach of that duty by the defendant; a causal connection between the defendant's breach of that duty and the resulting injury; and actual loss or damage suffered by the complainant. ***Reilly v. Tiergarten Inc.***, 633 A. 2d 208 (Pa. Super. 1993); ***accord R.W. v. Manzek***, 888 A. 2d 740, 746 (Pa. 2005). Establishing only a breach of duty, *i.e.*, negligent conduct, does not automatically entitle a plaintiff to damages. A plaintiff also must prove causation before being allowed to proceed to the question of damages. Additionally, Pennsylvania law provides that if a plaintiff's negligence is greater than the causal negligence of the defendant or defendants, *i.e.*, greater than 50%, against whom recovery is sought, a plaintiff may not recover damages. ***See*** 42 Pa.C.S.A. § 7102(a) ("the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is

_____

In addressing this first issue, the prior panel of this Court, in considering collateral estoppel, concluded Lloyd was estopped from arguing that he did not intentionally shoot Appellant and from arguing that he had a reasonable belief that such action was necessary. In their Supplemental Brief to this Court, submitted prior to *en banc* consideration, Appellants agree with this conclusion. Supplemental Brief for Reargument at 12. As we explain, *infra,* this alone does not settle the question of liability as contended by Appellants.

sought."). As will be explained, Lloyd's conviction for voluntary manslaughter conclusively established under collateral estoppel facts determined in his criminal trial, but that did not answer the questions of causation or comparative fault that also had to be determined before the jury could consider damages.

Our examination begins with the opinion and order of the Lackawanna County Court which granted the Rogers Estate's motion for partial summary judgment.[11] The Rogers Estate's motion was premised on the argument that collateral estoppel bound the issue of Lloyd's *liability* in that civil proceeding. Lackawanna County Court Opinion, 10/1/14, at 1 (unpaginated). The court reasoned that principles of collateral estoppel barred Lloyd from relitigating the issue of *intent* in this civil action. It concluded in somewhat cryptic language that the conviction of voluntary manslaughter permitted the court to make a finding of collateral estoppel "to effectuate the purposes of the precedent of this principle of law." *Id.* at 3 (unnumbered). The court, therefore, granted the Rogers Estate's motion for partial summary judgment only as to Lloyd. While the Rogers Estate's motion sought a judgment that collateral estoppel bound the issue of "liability," the court in granting the motion went no further than to conclude that Lloyd's conviction for voluntary manslaughter established that he committed an intentional killing. *Id.*

---

[11] At the time the motion was filed, the Rogers Estate had not yet been consolidated with the Alvarez Estate in the Susquehanna County Court.

To address the effect of collateral estoppel upon these civil proceedings resulting from Lloyd's previous criminal conviction, we find it necessary to review briefly the development of our case law on this issue.

For many years in Pennsylvania, judgments in criminal cases were held inadmissible to establish facts in a civil case. *See Hurtt v. Stirone*, 206 A.2d 624, 626 (Pa. 1965). It appears that the case of *Greifer's Estate*, 5 A.2d 118 (Pa. 1939), marked the earliest departure from this evidentiary prohibition. In *Greifer*, the question was whether a wife, who killed her husband and was convicted of murder of the first degree, could successfully claim benefits coming to her under a trust created by him for her benefit. The Court held that the wife was barred by the common law principle that a person will not be permitted to profit by their own wrong, particularly by their own crime. This was followed in the case of *Mineo v. Eureka Sec. Fire & Marine Ins. Co.*, 125 A.2d 612 (Pa. Super. 1956), wherein this Court considered whether it should permit recovery from insurance companies for a fire loss, when the insureds were properly convicted of procuring the burning of the property for which recovery was sought. Citing *Grefier*, we noted there was disagreement among jurisdictions concerning the evidence necessary in a civil action to establish the fact of the insured's criminal responsibility for the damage, and whether the conviction was a bar to bringing the action. The central question was what use can be made in a civil action of the insureds' conviction of arson. In this regard, the *Grefier* Court was called upon to determine whether the criminal conviction was a bar to the civil action as

contended by the defendants, whether it was inadmissible in a civil action for any purpose as contended by the plaintiff, or whether it was admissible as *prima facie* but not conclusive evidence of guilt as held by the court below. Upon review, we held that the insured's conviction was a complete bar to recovery, acknowledging that this position, at that time, was contrary to the more generally accepted rule throughout the country. In coming to this conclusion, we explained:

> This rule is founded upon the public interest which requires that the laws against crime be enforced, and that courts aid no man in any effort he may make to benefit from his own violation of them. The rule is enforced upon the ground of public policy alone and not out of consideration for the defendant to whom the advantage is incidental.
>
> This case does not present a question which in our opinion can properly be disposed of by the application of some technical rule of evidence, such as a ruling that the first conviction is hearsay when admitted in the civil action. **It is a question which turns upon the principle of estoppel. It is a matter of public policy. It is a matter of recognizing a judgment of a court.**

*Mineo*, 125 A.2d at 617 (internal citation omitted) (emphasis added). This Court in *Mineo* looked not only to public policy, but perhaps for the first time also announced this rule as a bar to recovery based upon the principle of estoppel.

In *Kravitz's Estate*, 211 A.2d 443 (Pa. 1965), our Supreme Court detailed more precisely what was established by way of a prior conviction. There, the question presented was whether a wife, convicted of murdering her husband, was precluded from benefitting from his estate under the Slayer's

Act of 1941.[12] That law provided "No slayer shall in any way acquire any property or receive any benefit as the result of the death of the decedent." In concluding that the issue of murder could not again be litigated by the wife in the Orphans' Court, or in a civil action in any other court, the Court acknowledged that a growing minority of jurisdictions, including the federal courts, would admit the criminal record **as evidence of the facts** determined in the criminal proceeding unless excluded by statute, as opposed to what was the rule then in most jurisdictions that a judgment entered in a criminal case was not proof of anything in a subsequent civil case other than the fact of its rendition. Following the more expansive view, the Court ruled that (1) the record of conviction and judgment of sentence of the wife for the murder of her husband was not merely *prima facie* evidence thereof, but was a conclusive bar to her right to take under or against her husband's will, and (2) that neither the question of "murder" nor her guilt or innocence of the crime could be relitigated in the Orphans' Court. Hence, in addition to concluding that the fact of the conviction was admissible and a conclusive bar to recovery under the Slayer's Act, the Court held that the questions of murder, guilt, or innocence likewise could not be relitigated in the civil proceeding.

Building upon these earlier cases, in **Shaffer v. Smith**, 673 A.2d 872 (Pa. 1996), our Supreme Court granted *allocatur* to determine the point at which a criminal conviction is considered final in order to serve as a basis for

---

[12] 20 P.S. §§ 3441-3456 (repealed).

collateral estoppel in a civil trial. The Court held that the appellant's prior criminal conviction was final for purposes of collateral estoppel, notwithstanding appellant's filing of a Post Conviction Relief Act ("PCRA") petition. *Shaffer* appears to be the first case in which the Court examined the effect of a criminal conviction in a subsequent case by expressly couching the issue in terms of "collateral estoppel."[13] Relying upon *Folino v. Young*, 568 A.2d 171 (Pa. 1990), *Kravitz*, and *Hurtt*, the *Shaffer* Court stated that it was well established that a criminal conviction collaterally estops a defendant from denying his acts in a subsequent civil trial. Importantly, the Court emphasized that unlike merger and bar (*res judicata*) that establish claim preclusion, collateral estoppel is applicable only to *essential issues of fact* that have been litigated. *See Shaffer*, 673 A.2d at 675, *see also Zarnecki v. Shepegi*, 532 A.2d 873, 878-79 (Pa. Super. 1987) (defendant in a mortgage foreclosure action precluded under collateral estoppel from claiming her signature on a mortgage was a forgery, since issue of signature already litigated in a prior action). Collateral estoppel not only conclusively

---

[13] The *Shaffer* Court explained:

> [A] plea of collateral estoppel is valid if, 1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merits, 3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, [and] 4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

*Shaffer*, 673 A.2d at 876 (citations omitted).

establishes the fact of a conviction, but also of the facts actually litigated to reach the conviction. ***Zarnecki***, 532 A.2d at 874-75.

As applied to the present circumstances, under collateral estoppel, Lloyd's criminal conviction not only conclusively established his guilt of voluntary manslaughter, but also those facts necessary and actually litigated to arrive at that conviction.

The crime of voluntary manslaughter is defined under Pennsylvania law as follows:

> **§ 2503.  Voluntary manslaughter.**
>
> **(a) General rule.--**A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> (1)  the individual killed; or
>
> (2)  another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.
>
> **(b) Unreasonable belief killing justifiable.--**A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.
>
> **(c) Grading.--**Voluntary manslaughter is a felony of the first degree.

18 Pa.C.S.A. § 2503.  At his criminal trial Lloyd claimed self-defense as justification for the killings.  According to the Lackawanna County Court, the trial court in Lloyd's criminal case submitted to the jury the elements of

voluntary manslaughter and the issues of "Self Defense and Justification." Lackawanna County Court Opinion, 10/1/14, at 1 (unpaginated). Once self-defense and justification were raised as defenses to the charge of voluntary manslaughter, the Commonwealth had the burden of proof to demonstrate beyond a reasonable doubt that Lloyd's belief that he had justification to use deadly force was "unreasonable." *See Commonwealth v. Rivera*, 983 A.2d 1211, 1221 (Pa. 2009) ("When a defendant introduces evidence of self-defense, the Commonwealth bears the burden of disproving such a defense beyond a reasonable doubt."). Lloyd's defense, also known as imperfect self-defense, "is imperfect in only one respect—an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life." *Id.* at 1224 (citing *Commonwealth v. Tilley*, 595 A.2d 575, 582 (Pa. 1991)). The Commonwealth met its burden, and thus, as applied to these civil cases, collateral estoppel conclusively established **both** that Lloyd's conviction for voluntary manslaughter evidenced an intentional killing and that he acted "unreasonably" in his belief that he was justified in the use of deadly force. These were the essential facts found that were necessary to arrive at Lloyd's conviction. The jury in these civil actions was entitled to have been informed of Lloyd's conviction and, equally as important, that Lloyd was found to have acted *unreasonably* and therefore negligently, because the *sine quo non* to find that a person acted negligently in a civil action is a finding that the person

acted unreasonably."[14]  ***See Rutter v. Northeastern Beaver County School District***, 437 A.2d 1198, 1212 (Pa. 1981) (Nix, J. dissenting) ("The benchmark of negligence is conduct expected of the proverbial reasonable man."); ***Lanni v. Pennsylvania R. Co.***, 88 A.2d 887, 888 (Pa. 1952) ("Negligence is the absence or want of care which a reasonable man would exercise under the circumstances."); ***Martin v. Evans***, 711 A.2d 458, 461 (Pa. 1998) (negligence is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances); ***see also*** Pa. Standard Suggested Jury Instruction (Civil) 13.10 ("A person who fails to do something a reasonably careful person would do under the circumstances is negligent.").  However, while Lloyd's conviction for voluntary manslaughter established under collateral estoppel that he acted negligently, it did not conclusively establish that he was liable for civil damages.  Damages only could be awarded after establishing causation, and then only if Decedents were not more than 50 percent casually negligent for bringing about their harm.

_____

[14] We do not equate criminal negligence with the civil tort of negligence.  A person acts "negligently" with respect to a material element of a criminal offense if their conduct, *inter alia*, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation. 18 Pa.C.S.A. § 302(b)(4).  Negligence, however, is not a term used under Section 2503(b)'s justification provision.  Rather, Section 2503(b) speaks in terms of a person's belief being "unreasonable" that we deem analogous for our present purposes to acting negligently in these civil actions. ***See Commonwealth v. Carter,*** 466 A.2d 1328 (Pa. 1983) (under Section 2503(b), a defendant's belief, sincere though unreasonable, negates malice).

The principal error in Appellants' argument that Lloyd's conviction conclusively established his "liability" and therefore, entitled them to a new trial on damages, ignores that all elements of a negligence cause of action must be satisfied to permit a recovery. Appellants fail to recognize the limits of collateral estoppel. All that Lloyd's criminal conviction collaterally established in these actions is that he committed the crime of voluntary manslaughter, an intentional killing, and that he did so under the unreasonable belief he was justified in so doing. Appellants are not entitled to relief on this issue.[15]

---

[15] In declining to join our analysis in Parts III.A and III.B, our Learned Colleague in her concurrence believes that we erred by concluding that the crime of voluntary manslaughter conclusively establishes two elements of the tort of negligence—the existence of a duty and a breach of that duty. To clarify, what we have determined is that under principles of collateral estoppel, certain **facts** established during Lloyd's criminal trial for voluntary manslaughter were deemed to be conclusively established for purposes of these civil actions. Those facts being that he committed an intentional killing but under an unreasonable belief that his actions were justified. With these facts conclusively established, Lloyd's actions must be considered negligent *per se*. The Legislature has specified that under these circumstances the standard of conduct justifying the use of lethal force in self-defense was not met, because Lloyd's belief was unreasonable, thus rendering his actions negligent *per se*. **See Cabiroy v. Scipione**, 767 A.2d 1078, 1079 (Pa. Super. 2001) (citation omitted), **appeal denied**, 782 A.2d 541 (Pa. 2001); Restatement (Second) Torts § 288B. A finding of negligence *per se*, however, does no more than satisfy a plaintiff's burden of establishing that a defendant's conduct was negligent. The burden remains upon a plaintiff to establish still that his complained of injuries were proximately caused by the statutory violations. **Congini v. Portersville Valve Co.**, 470 A.2d 515, 518 n.4 (Pa. 1983).

The Concurrence opines that any analysis of negligence concepts here is misplaced because Lloyd's conviction for voluntary manslaughter was in
*(Footnote Continued Next Page)*

## B. Comparative Negligence

In the second question presented, Appellants argue that the trial court committed error by permitting the jury to consider the issue of comparative negligence. They argue that comparative negligence does not apply where the defendant's conduct is "reckless, wanton, or willful" and the conduct of the plaintiff only negligent.[16] They contend comparative negligence should not have been applied where Lloyd's criminal conviction established that the killings were intentional, a standard well above recklessness. Appellants therefore argue that none of the evidence introduced to demonstrate

_____

essence a battery, or an intentional tort that does not permit consideration of negligence principles. We accept the well-settled proposition that "negligence principles generally do not apply" to an intentional tort such as battery. *Isaac v. Jameson Mem'l Hosp.*, 932 A.2d 924, 929 (Pa. Super. 2007) (citation omitted); *see also Martin v. Yeoham*, 419 S.W.2d 937, 944-45 (Mo. App. 1967) (distinguishing between the right of action for injury caused by an intentional shooting and that arising from an unintentional, negligent shooting). That general principle, however, must yield here where the crime of voluntary manslaughter, as provided by our Legislature, allows for a conviction when a person does not act reasonably (the standard for civil negligence), *see Rutter*, *Lanni*, and *Martin*, *supra*, thus casting an admittedly intentional act as one done negligently. Although there cannot be any dispute Lloyd intentionally shot the decedents, the finding of the jury in his criminal case determined that his belief was unreasonable and hence his actions the result of negligence. While our Learned Colleague focuses on the intentional aspects of a battery, she fails to consider the unreasonable or negligent components of the crime of voluntary manslaughter that cast Lloyd's actions as negligent thereby rendering her analysis flawed.

[16] Arguably, Appellants may have waived any right to raise this issue, because the special verdict slip submitted by them to the trial court asked the jury both to find that Lloyd intentionally and/or recklessly killed Decedents and *to find whether any of the defendants were negligent*, a point they now contend was error. *See* Verdict Slips, 4/26/18, at 1-4.

comparative negligence on the parts of Decedents was relevant or admissible. We disagree.

Although our Supreme Court has not addressed the issue, both this Court and our sister court, the Commonwealth Court, have held that the Comparative Negligence Act[17] does not apply in a situation where a plaintiff may be guilty of negligence, but a defendant has acted recklessly. ***See Straw v. Fair***, 187 A.3d 966, 1000 (Pa. Super. 2018) (citing ***Johnson v. City of Philadelphia***, 808 A.2d 978, 983 (Pa. Cmwlth. 2002) ("[u]nder the Comparative Negligence Act, the only conduct that is statutorily authorized to be compared is negligent conduct")).[18,19] Negligence and recklessness are different in kind. ***See id.*** at 1002; ***see also*** Restatement (Second) Torts § 500 (1965), *cmt.* g.; ***Tayar v. Camelback Ski Corp.***, 47 A.3d 1190, 1201-02 (Pa. 2012) (noting that the "conceptualization of recklessness as requiring *conscious* action or inaction not only distinguishes recklessness from ordinary negligence, but aligns it more closely with intentional conduct."). Lloyd argues in response that Appellants' argument is flawed because there never has been

---

[17] 42 Pa.C.S.A. § 7102.

[18] Cases cited by Appellants pre-date the Comparative Negligence Act. Appellants' Brief at 51-52.

[19] ***See also Krivijanski v. Union R. Co.***, 515 A. 2d 933, 936-37 (Pa. Super. 1986) (comparative negligence does not apply to willful and wanton conduct which exists where the danger to the plaintiff, though realized, is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong).

any type of determination by any court, in any proceeding, that any conduct on the part of Lloyd was "willful, wanton, or reckless". Corrected Brief of Lloyd at 16. We agree. Lloyd was convicted of intentional killings under an unreasonable belief he was justified in doing so. Nowhere in the plain language of Section 2503 that defines the crime of voluntary manslaughter is there a requirement that a person be found to have acted "recklessly" to be guilty of that crime.[20] Instead, the statute criminalizes an intentional killing committed under an "unreasonable" belief, the standard for negligence, that deadly force was justified—otherwise known as "imperfect self-defense." *Rivera*, 983 A.2d at 1224.

Appellants insist that because Lloyd was found to have intentionally killed Decedents, even under an unreasonable belief, that it was error to submit comparative negligence to the jury because intentional conduct is more egregious than reckless conduct. The flaw in Appellants' reasoning is that in arguing culpability greater than recklessness, they attempt to divorce Lloyd's volitional act from his state of mind—an unreasonable belief—by focusing only upon the intentional aspect of voluntary manslaughter. To claim only that Lloyd was found guilty of intentional killings inaccurately represents the crime for which he was convicted. Although accurate that the act of shooting

---

[20] *Cf.* 18 Pa.C.S.A. § 2504(a) ("A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person.").

Decedents was done volitionally, and therefore in that sense intentionally, the crime was committed without malice[21] and under a belief, albeit unreasonable, that the act was justified as self-defense. It is this state of mind that was conclusively established under Lloyd's conviction, a state different in kind from recklessness. A person may be found to have acted intentionally, but that does not necessarily mean that they also acted recklessly. Although not the case here, in fact, it very well is possible that a person may act intentionally and not negligently. Appellants are incorrect to assert that intentional conduct also must include reckless conduct. The trial court did not err in charging the jury on comparative negligence. Accordingly, Appellants' argument fails.

## C.    Nonsuit as to Defendant Hayden Thomas

Appellants' third issue in non-specific fashion challenges "[w]hether nonsuit should have been denied when there was sufficient evidence of record to establish liability." Rule 2116 of our Rules of Appellate Procedure requires that the statement of the questions involved must state concisely the issues to be resolved, *expressed in the terms and circumstances of the case* but without unnecessary detail. Pa.R.A.P. 2116(a). Appellants' statement of this third issue violates this rule and leaves us to guess as the substance of this issue. Appellants' opening brief reveals that this issue pertains to the nonsuit granted in favor of Hayden. In a discussion spanning approximately ten pages, Appellants fail to cite a single authority that identifies the legal basis

---

[21] Voluntary manslaughter is an intentional killing committed without malice. ***Commonwealth v. Heatherington***, 385 A. 2d 338, 341 (Pa. 1978).

upon which liability was sought against Hayden. Instead, Appellants' brief provides approximately four pages of boilerplate citation to cases discussing the standard for the granting of a compulsory nonsuit. *See* Appellants' Brief at 46-49. The remainder of Appellants' argument does nothing more than recite to us trial evidence[22] as to why the gun used by Lloyd should have been restricted by Hayden and the Outdoorsman.

In lieu of disclosing to us the legal basis as to why these facts may impose liability, Appellants simply "urge" us to read the July 18, 2016 Lackawanna County Court Opinion, that apparently details the evidence adduced during discovery that led that court to deny summary judgment to Hayden. *Id.* at 41. Appellants argue, again, without authority, that it logically follows that if those facts were adduced at trial, nonsuit should have been denied to Hayden. *Id.* Presenting argument to us without citation to legal authority may result in waiver. *See* Pa.R.A.P. 2119 (setting forth argument briefing requirements, including "discussion and citation of authorities" and "reference to the place in the record where the matter refers to appears");

---

[22] Insofar as Appellants reference the "Wolfe Report" in their brief, we decline to consider the report because it was excluded as evidence during trial and, critically, Appellants failed to preserve any challenge to its exclusion in their Rule 1925(b) statement. It is black letter law in Pennsylvania that issues not included in a Rule 1925(b) statement or fairly suggested by the issue(s) stated are deemed waived. *See* Pa.R.A.P. 1925(b)(4)(v) and (vii), *see also **Greater Erie Indus. Dev. Corp. v. Presque Isle Downs, Inc.***, 88 A.3d 222, 224 (Pa. Super. 2014) (*en banc*) (noting that our Supreme Court will not countenance anything less than strict application of waiver pursuant to Rule 1925(b)).

***see also Giant Food Stores, LLC v. THF Silver Spring Development, L.P***., 959 A.2d 438, 444 (Pa. Super. 2008) (holding that failure to support an argument with citation to authority results in waiver), ***appeal denied***, 972 A.2d 522 (Pa. 2009).  Urging this Court to investigate another court's opinion to discern Appellants' arguments improperly requests that we scour the record for ourselves and act as counsel to Appellants, something this Court will not and cannot do.  ***See Hayward v. Hayward***, 868 A.2d 554, 558 (Pa. Super. 2005) (observing it is not the duty of this Court to "scour the record" and "act as the appellant's counsel" and declining to do so).  Arguing that the denial of summary judgment should somehow control whether a nonsuit should be granted at trial is clearly erroneous.  As Appellees correctly point out, consideration of a compulsory nonsuit motion at trial must be based upon the evidence introduced at trial.  ***See*** Pa.R.Civ.P. 230.1. A trial court only may consider the trial evidence introduced by the plaintiff(s) and any favorable evidence introduced by the defendant(s) when passing upon a motion for compulsory nonsuit.  ***Id.***  The evidence considered under a summary judgment motion may or may not be the same as that admitted at trial.

Our consideration of this third issue further is complicated by the fact that Appellants' supplemental brief, prepared for *en banc* consideration, does not discuss the claimed error that a nonsuit was improperly entered in favor of Hayden.  Instead, the supplemental brief urges us to vacate the judgment entered in favor of the Outdoorsman and remand for a new trial so that the

issue of the Outdoorsman's vicarious liability may be considered. **See** Appellants' Supplemental Brief at 16-20.

Once again, several problems are present that preclude us from considering this request. First and foremost, this issue was not raised or preserved in Appellants' Rule 1925(b) statement. On this basis alone the issue is waived. **See** Pa.R.A.P. 1925(b)(4)(v) and (vii). Second, the statement of questions presented in Appellants' brief does not include this issue.[23] This constitutes a second basis for waiver. **See** Pa.R.A.P. 2116(a) (stating that "[n]o question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby"). Lastly, to the extent Appellants rely upon this Court's prior panel decision (that has been withdrawn) that also granted a new trial as to the Outdoorsman, that reliance is misplaced. Our prior panel concluded that the trial court erred in failing to instruct the jury it had to find Lloyd negligent. A new trial would have had to include the Outdoorsman given the vicarious liability claim. Here, however, where we now conclude that Appellants are not entitled to a new trial, no independent basis has been preserved for us to review any error now claimed that the Outdoorsman is entitled to a new trial.

---

[23] The granting of reargument does not permit a litigant to introduce new issues that have not already been preserved. **See** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

While we have identified sufficient bases upon which we could find waiver of Appellants' third issue, out of an abundance of caution we choose not to do so. We will however only address the argument(s) properly preserved to the extent appellate review is not impeded. To that end, our review of Appellants' Rule 1925(b) statement discloses that with respect to this third issue, under the heading "DIRECTED VERDICT FOR DEFENDANT", Appellants state:

> 59) A review of the facts adduced during trial clearly will reveal that Hayden Thomas should not have had a directed verdict entered against Plaintiffs as to him.
>
> 60) Based on the facts, there was direct and circumstantial evidence that Lloyd Thomas was a "feeble minded adult" as defined by the case law of the Commonwealth.
>
> 61) In addition, there were numerous other counts and claims that would apply to Defendant Hayden Thomas based upon the facts, law, and Restatements.
>
> 62) As objected to, the trial court dismissed Hayden Thomas in total, despite the Defense Attorneys only moving to have him dismissed on the "feebleminded issue."

Appellants' Rule 1925(b) Statement, 1/15/19, at ¶¶ 59-62 (unpaginated).

Appellants' Rule 1925(b) statement has misstated the basis upon which Hayden was dismissed from these actions. Hayden was not dismissed upon a motion for directed verdict that properly only may be made upon the close of all trial evidence. *See* Pa.R.Civ.P. 226(b) ("At the close of all the evidence, the trial judge may direct a verdict upon the oral or written motion of any party."). Hayden was dismissed from these actions upon a motion for

compulsory nonsuit. **See** Pa.R.Civ.P. 230.1. While the standard for granting a compulsory nonsuit and that for directed verdict share similarities, in that both demurrer to the evidence, the scope of review under each is different. "A motion for compulsory nonsuit allows a defendant to test the sufficiency of a plaintiff's evidence" and is made at the close of the plaintiff's case. **Atlantic Richfield Co. v. Razumic**, 390 A. 2d 736, 744 (Pa. 1978). A motion for directed verdict, like a motion seeking judgment notwithstanding the verdict ("JNOV"), requires a court to test the sufficiency of all evidence at the close of a case. **Reading Radio, Inc. v. Fink**, 833 A.2d 199, 210 (Pa. Super. 2003), **appeal denied**, 847 A.2d 128 (Pa. 2004). Regardless, given the similarities between our review of a compulsory nonsuit and that of a directed verdict, and that Appellants' reference in their Rule 1925(b) statement and brief speak in terms of when the trial court dismissed Hayden from this case, we will consider Appellants' reference to a "directed verdict" in their Rule 1925(b) statement as mere misspeak, and treat the issue as challenging the granting of a compulsory nonsuit.[24]

Our willingness to overlook this misstep, however, does not resolve what issue has been preserved. Upon review, we conclude that the only basis

---

[24] Some of this confusion could have been avoided if Appellants had seen fit to include in their brief, as required by our appellate rules, the verbatim text of the court's order granting the motion for compulsory nonsuit. **See** Pa.R.A.P. 2115. Instead, in their brief, in lieu of a verbatim text of the order, Appellants simply state that the trial transcript demonstrates the trial court granted the nonsuit as to Hayden. Appellants' Brief at 6. Within the certified record, however, is a written order dated April 24, 2018, granting the motion for nonsuit.

preserved by Appellants upon which to challenge the nonsuit granted in favor of Hayden, is their argument that they produced enough evidence to demonstrate that Hayden knew Lloyd was "feebleminded." Appellants' statement that there were numerous other counts and claims that would apply to Hayden based upon the "facts, law, and [r]estatements," is flagrantly too general to preserve any issue that might be contained within that statement. Nor do Appellants' briefs provide any further clue as to the plethora of laws or theories that might be encompassed within this overly broad claim. The purpose of a Rule 1925(b) statement is to clarify the errors complained of on appeal. Pa.R.A.P. 1925(b). Therefore, we consider anything beyond the issue of feeblemindedness to be waived.

On the merits of this third issue, we consider whether sufficient trial evidence was introduced by Appellants to establish that Hayden knew Lloyd to be a feebleminded adult so as to make him responsible for Lloyd's use of a gun at the Outdoorsman. Although no authority is found in Appellants' brief that addresses this proposition, Hayden and the Outdoorsman reference the case of *Wittrien v. Burkholder*, 965 A.2d 1229 (Pa. Super. 2009) and the Restatement (Second) Torts § 308, as the relevant law on this issue. So too did the Lackawanna County Court when deciding whether to grant summary judgment to Hayden and the Outdoorsman.

In *Wittrein*, the parents of Gary M Burkholder, a 20-year-old adult, were sued by the plaintiff when Gary shot him with a 12 gauge shotgun. Gary lived with his parents and legally purchased the shotgun when he was 18 years

old. The plaintiff had gone to the Burkholder residence to pick up his daughter after he was told that Gary was drinking and in a violent state. When plaintiff arrived, he was shot by Gary. The gun was kept by Gary in a locked cabinet in his room. Prior to the incident, Gary's father took the shotgun and hid it because Gary was threatening suicide. Some five to seven months prior to the incident Gary took possession of the gun again. As of the time of the incident Gary's parents knew that Gary had violent propensities, became violent when drunk, and had a history of violent behavior. Gary's father feared for his son's safety two years prior to the shooting and realized Gary should not have a shotgun. He described Gary as a ticking time bomb and knew of Gary's communications with hate groups, a prior conviction for assault, drinking problems, and violent propensities. Gary also was into white supremacy and had to attend anger management and pay a fine. He had anger problems since he was in about 11th grade. The father also indicated that Gary had been listening to bad tapes, was arrested for assault on a black man at work, and was in jail for 10 days for that offense. Despite this history, Gary's parents moved for summary judgment. The resolution of that motion turned upon the proper application of the Restatement (Second) of Torts § 308. That section provides:

> Permitting Improper Persons to Use Things or Engage in Activities
>
> It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others.

COMMENTS AND ILLUSTRATIONS: Comment:

a. The words "under the control of the actor" are used to indicate that the third person is entitled to possess or use the thing or engage in the activity only by the consent of the actor, and that the actor has reason to believe that by withholding consent he can prevent the third person from using the thing or engaging in the activity.

*Wittrein*, 965 A.2d at 1232 (citations omitted).  Noting that Pennsylvania had expressly adopted Section 308, the court canvassed decisions finding only three Pennsylvania cases applying that section to the negligent entrustment of a gun, all of which involved minor children.  *See Frey v. Smith*, 685 A.2d 169 (Pa. Super. 1996), *appeal denied*, 700 A.2d 441 (Pa. 1997); *Johnson v. Johnson*, 600 A.2d 965 (Pa. Super. 1991); *Mendola v. Sambol*, 71 A.2d 827 (Pa. Super. 1970).  In *Mendola* we concluded the defendant father was subject to liability for leaving a gun out where his 11-year-old son was able to use it in the shooting of another child.  We noted that "*it is negligent to place loaded firearms or poisons within reach of young children or feebleminded adults*."  *Mendola*, 71 A.2d at 829 (emphasis added).

One out-of-state case was found by the *Wittrein* Court involving negligent entrustment of a gun to a defendant's adult son: *Tissicino v. Peterson*, 121 P.3d 1286 (Ariz. 2005).  The record in *Tissicino* revealed that the adult son had a below average intelligence quotient, a drinking problem, brain damage, and cognitive disorder.  The court noted that it is the right to control the chattel in question, rather than legal ownership, that is necessary to prove a negligence entrustment claim under Section 308.  The court

concluded the plaintiff had the right to proceed to trial on the issue of whether the defendant's mother had the right to control the gun in that case.

Ultimately, we affirmed the granting of summary judgment in **Wittrein** despite evidence that Gary's parents had confiscated the gun—nine months prior to the shooting—after Gary threatened suicide. The gun, however, was returned to Gary approximately five to seven months prior to the shooting. We concluded that the record failed to reflect evidence that Gary's parents had the right to control the gun on the day of the shooting. The temporary confiscation of the gun in an emergency situation failed to support a conclusion that Gary had the right to use the gun only by the consent of his parents. While the record also reflected evidence of Gary's violent propensities and bigotry, significantly, there was no evidence of any cognitive disability that rendered him a "feebleminded adult" whose mental capacity was commensurate with that of a young child at the time of the incident. Plaintiff failed to establish that the parents had the right to control the firearm of their adult son. Summary judgment was properly granted.

Presently, we likewise conclude that the trial court correctly granted a compulsory nonsuit in favor of Hayden because Appellants failed to carry their burden of proving that Hayden had the right to control the gun used by Lloyd as a feebleminded adult son.

In their brief, Appellants point to trial evidence they claim established that Hayden owned the weapon used by Lloyd. They cite a Department of Justice Firearm Trace Summary revealing that, as of the time of the killings,

the gun was in the name of the person who traded it to the Outdoorsman. They claim testimony from Hayden and Lloyd established the gun belonged to the Outdoorsman until its transfer to another individual. Appellants then address witness testimony. They point to the testimony of a Jeffrey Gunn who testified that Lloyd previously chased him with his vehicle for no reason. They refer to another witness, John Touch, who testified Lloyd became paranoid around the time of the shootings and that he relayed this to Hayden on, at least, two occasions prior to the shootings. Another witness, Brian Griffiths testified that Lloyd one day grabbed an American flag, threw it on the ground, and jumped on it. Still another, Alphonso Troianello, testified that before the shooting he went to the Outdoorsman and after he parked his truck, Lloyd's vehicle came up behind him whereupon Lloyd exited his vehicle and began to yell and scream for no reason. Charles Pettinato testified that before the shooting he noticed Lloyd would act erratically. Kathryn Chesnick, a nurse anesthetist, testified that shortly before the killings she felt it necessary to call 911 and report that Lloyd was acting a little bit aggressive and cursing. Appellants claim that she stated she called the police and told them Lloyd was off his rocker and not acting like himself and fearing he was going to kill himself or somebody. She further acknowledged she relayed that Lloyd was like a schizophrenic in crisis and believed something bad was going to happen. Ms. Chesnick relayed she believed Lloyd was going crazy. *See* Appellants' Brief at 40-45.

In response, Hayden and the Outdoorsman dispute much of Appellants' recitation and characterization of trial testimony. They argue that there was no evidence that either Hayden or the Outdoorsman owned the gun. The so-called uncontroverted evidence that the Outdoorsman owned the weapon consisted of the Firearm Trace Summary that showed only the last purchaser of the gun, but did not identify any ownership by the Outdoorsman. Further, they point to Lloyd's testimony where he admitted he owned the gun. They claim there was no evidence whatsoever that Hayden or the Outdoorsman had the ability to control access to Lloyd's personal weapon. With respect to witness testimony, they point out that Jeffrey Gunn's testimony related to an incident that happened in approximately 2008 or 2009, and that Gunn never spoke to Hayden about the incident. Likewise, they point out that the incident relayed by Brian Griffis occurred 10 to 11 years before the shootings and that Griffis also never spoke to Hayden about the prior incident. They claim the same also was true with respect to the incident described by Alfonso Troianello in that he too never spoke to Hayden about his incident. With respect to Kathryn Chesnick's 911 call, they claim her statement Lloyd was going to kill someone was actually found in a police report authored a year and a half after the shootings and was not found in the police report prepared following the 911 call. They further point out that Ms. Chesnick disputed the statement attributed to her in the police report that she and several other people had been telling Hayden that Lloyd needs help. Appellees claimed that Ms. Chesnick noted she never spoke to Hayden about his son. In addition,

Corporeal Scott Walck of the Pennsylvania State Police testified that when he spoke to Ms. Chesnick on the 911 call, she indicated she did not see or hear anything that would make her believe Lloyd was a danger to himself or others and did not tell him she believed Lloyd was going to kill someone. Corporeal Walck testified further that he did call Hayden to ask him to check on his son and explained how to get a 302 warrant for an involuntary commitment if things were not all right. Appellees further maintain that the testimony of John Touch and Charles Pettinato that Lloyd may have acted erratically at some unspecified times in the past does not establish a cognitive disability rendering him feebleminded or with the mental capacity of a child. ***See*** Hayden and The Outdoorsman's Brief at 37-42. During argument on the motion for compulsory nonsuit, counsel argued the inconsistency in Appellants' position. On the one hand, Appellants produced evidence that Lloyd attended Penn State University for three and a half years and had a lot of ability, as evidenced by the fact that Lloyd was Vice President of the Outdoorsman all day and every year, even after the shooting, and that Lloyd also was responsible for taking care of the paperwork. Yet, in the same breath, Appellants argued that Lloyd was feebleminded. ***See*** N.T., Trial, 4/24/18, at 164-65.

While we find it disconcerting that counsel would differ in so many respects as to what was testified to at trial, we need not resolve any of these disparities because, giving Appellants the benefit of all the evidence existing

as of the time compulsory nonsuit was granted, Appellants are not entitled to relief.[25]

To establish liability under Section 308, Appellants had to prove that Hayden had the right to control Lloyd's use of the gun, or in other words, that Lloyd only could use the gun with Hayden's permission. ***Wittrein***, ***supra*** (citing Section 308 and *cmt.* A). This is established in the case of a parent(s) permitting a minor child to use a weapon. In the case of an adult child, the right to control the gun must rest upon evidence that the adult child has a cognitive disability that would render the adult child "feebleminded" whose mental capacity is commensurate with that of a young child. ***Wittrein***, ***supra***. It is the right to control the weapon, rather than ownership that satisfies the control element under Section 308. ***Id.*** at 1233 (citation omitted). Our review of the evidence does not demonstrate that Appellants produced sufficient evidence to prove that Lloyd could possess the gun used in these shootings only with Hayden's permission. Ownership alone does not answer the question. ***Id.*** More important, Appellants failed to produce sufficient evidence that Lloyd was subject to Hayden's control as a feebleminded adult child suffering from a cognitive disability rendering him with a mental capacity of

---

[25] The standard for reviewing the validity of a compulsory nonsuit requires that the plaintiff be given the benefit of every fact and reasonable inference arising from the evidence. All conflicts in the testimony must be resolved in plaintiff's favor and the entry of the compulsory nonsuit is only supportable in a clear case where the facts and circumstances have as the only conclusion the absence of liability. ***Rutter***, 437 A. 2d at 1200 (citations and quotation marks omitted).

that of a young child. As ***Wittrien*** amply demonstrates, antidotal evidence merely implicating mental health concerns of an adult child, does not suffice to establish a cause of action under Section 308. Appellants produced nothing more at trial. The trial court did not err in granting the compulsory nonsuit in favor of Hayden. No relief is due on this issue.

**D.    Quashing the Trial Subpoena for Dr. Shovlin**

In their fourth issue, Appellants contend the trial court erred when it granted the motion to quash and/or for a protective order not to compel Dr. Michael Shovlin's appearance at trial.[26]

Appellants' counsel, Michael J. Pisanchyn, subpoenaed Dr. Michael Shovlin, a psychiatrist, neighbor, and friend of Lloyd and Hayden Thomas, to testify at trial commencing on April 16, 2018. Prior to receiving this subpoena, Dr. Shovlin, without counsel, provided testimony in a May 23, 2017 discovery deposition in response to a subpoena served by counsel for Hayden and the Outdoorsman. At the outset of that deposition with Dr. Shovlin uncounseled and present at the insistence of Appellants' counsel, Appellants' counsel voiced objections to the deposition proceeding under the procedural posture of these

---

[26] The standard of review regarding a motion to quash a subpoena is whether the trial court abused its discretion. However, if the questions raised are purely questions of law, this Court's standard of review is *de novo,* and its scope of review is plenary. ***Leber v. Stretton***, 928 A.2d 262, 266 (Pa. Super. 2007) (citations omitted), ***appeal denied***, 945 A.2d 172 (Pa. 2008).

cases. N.T., Deposition of Dr. Michael Shovlin, 5/23/17, at 4-6.[27] Appellants' counsel then proceeded to threaten Dr. Shovlin with a civil lawsuit if he was going to testify that he ever treated Lloyd, given that Lloyd previously testified Dr. Shovlin never provided any treatment to him. *Id.* at 5-6. He further threatened a suit for fraud against Lloyd if that was to be the case. *Id.* (noting that he would "raise fraud on behalf of your client for lying"). Appellants' counsel then announced Dr. Shovlin had the right to have an attorney present in the event he wanted to plead the Fifth due to potential exposure resulting from what he did in this case. *Id.* at 6.[28] Appellants' counsel then demanded to know whether Dr. Shovlin intended to proceed with the deposition without counsel and if he was going to testify without pleading the Fifth. *Id.* At the opening of questioning by defense counsel, Appellants' counsel interrupted to emphasize that if Dr. Shovlin was to be sued, that it would be by a suit commenced by Appellants' counsel. *Id.* at 9. He then asked once again if the witness should be present with counsel. *Id.* Dr. Shovlin's only response was that he was appearing as a fact witness and not as an expert, and that he would not agree to be deposed as an expert witness. *Id.* at 10. He then testified that he was never a doctor to Lloyd, never treated him, never

_____

[27] It appears Appellants' counsel did not think the discovery deposition was proper, because the Rogers Estate case already was listed for trial. It was his contention that a deposition would have been proper only if noticed under the Benet case. *Id.*

[28] It is entirely unclear from this record on what basis Appellants' counsel would make this statement.

maintained a record, never performed any examination, Lloyd never came to his office, and that there was never any exchange of payment for any type of treatment. *Id.* He offered advice to Lloyd's father, Hayden, who sought him out in 2005-06, as a result of an incident in South Carolina, to suggest some referral sources to get help for Lloyd. *Id.* at 19-23. He had a conversation with Lloyd that same day wherein he provided the same referral sources for help. *Id.* at 23. The deposition continued until it was time for Appellants' counsel to examine the witness. Immediately upon examining the witness, argument broke out regarding any advice defense counsel may have given the witness and thereafter, banter began between counsel and the witness over whether there was a doctor-patient relationship with Dr. Shovlin and whether the questions being asked were more appropriate for an expert witness. *Id.* at 32-37. Dr. Shovlin then excused himself from the deposition before its completion indicating that he felt the process was too adversarial. *Id.* at 38.

Pursuant to a February 2, 2018 order, Dr. Shovlin was directed to resume his deposition. At the opening of the deposition proceeding on April 6, 2018, Appellants' counsel served Dr. Shovlin a trial subpoena to appear the first day of trial scheduled for April 16, 2018. N.T., Deposition of Dr. Michael Shovlin, 4/6/18, at 9-10. During the course of the deposition, Appellants' counsel explored with Dr. Shovlin his relationship with Lloyd, whether he ever had a doctor-patient relationship with Lloyd, other people that knew Lloyd, the 2005-06 South Carolina incident, the shootings in this case, and in detail

his knowledge of any mental health issues experienced by Lloyd or his observations of any bizarre behavior by Lloyd.

On April 12, 2018, counsel for Dr. Shovlin filed a "Motion to Quash Trial Subpoena and/or Motion for Protective Order" ("Motion") pursuant to Pa.R.Civ.P. 234.4, to excuse Dr. Shovlin from appearing at trial. In his motion, Dr. Shovlin relayed that the May 23, 2017 deposition proceeding was inappropriate, unprofessional, abusive, belligerent, hostile, intimidating and disrespectful, including threatening, without justification or substantiation, to personally sue Dr. Shovlin and to have him criminally prosecuted.[29] Motion, 4/12/18, at ¶ 5. Dr. Shovlin also relayed that Appellants' counsel repeatedly sparred with and verbally attacked defense counsel, further engendering an intolerable hostile atmosphere in the deposition room, causing him at that point to be in a state of confusion, fear, exasperation, alone and unprotected without legal representation, and causing him to then abruptly depart from the deposition. *Id.* Dr. Shovlin relayed Appellants' counsel's attempt, without apparent success, to elicit from him admissible testimony that would support a theory of the case that Lloyd suffered from a mental illness or emotional

---

[29] The basis upon which Appellants' counsel made the intimidating statements to Dr. Shovlin is not clear, but doing so potentially raises serious concerns about the propriety of counsel's conduct. *See* Pennsylvania Rules of Professional Conduct 3.1, 4.1, 4.4, and ABA Formal Opinion 92-363 (1992).

disturbance. *Id.* at ¶ 8. Dr. Shovlin advised that he and his wife[30] are suffering severe and debilitating medical conditions that would render it impossible for them to appear and testify at trial without exposing them to a risk of grave harm to their physical and emotional health. *Id.* at ¶ 15. In particular, Dr. Shovlin advised that he is suffering from post-traumatic stress disorder ("PTSD") and that he is in active treatment under the care of his primary health care provider who has provided him medication therapy and has referred him for psychiatric treatment in connection with his disabling PTSD condition. *Id.* at ¶ 16. Attached to his motion was an April 11, 2018 letter from his treating physician. The letter confirmed that, at that time, Dr. Shovlin was suffering from an acute decompensated form of post-traumatic stress disorder in direct relation to a set of circumstances involving his requirement to participate in legal depositions that resulted in severe and life-altering effects on his psychological state. *Id.* at Exhibit A. The letter further advised that Dr. Shovlin was close to experiencing a nervous breakdown as a result of the pressure he was experiencing. The doctor stated, without equivocation, his opinion that if Dr. Shovlin were compelled to appear in court, he may suffer permanent and irreversible harm through the additive effects of that exposure on top of his prior psychological trauma and brittle psychiatric state. This opinion was offered with an "absolute degree of medical certainty" and

---

[30] While the trial subpoena sought to compel the attendance of both Dr. Shovlin and his wife, Appellants have alleged error only as to the trial court's grant of relief to Dr. Shovlin. Therefore, we limit our discussion to the doctor and do not discuss his wife.

expressed the doctor's hope that unless the issue is of importance greater than that of the man's life, Dr. Shovlin should not be compelled to appear, at that time or in the foreseeable future. *Id.*

Against this background, Appellants contend that it was error for the trial court to grant the motion for a protective order, because Dr. Shovlin's testimony went directly to the heart of Appellants' cases. Appellants' Brief at 56. During argument on the Motion, Appellants' counsel revealed he was in possession of an August 29, 2013 state police report[31] that contained a summary of an interview with Dr. Shovlin. Appellants state that Dr. Shovlin is a very close friend of the Thomases and, without providing this Court any detailed comparison, claimed that Dr. Shovlin's deposition testimony is the exact opposite of almost everything he stated to the state police. *Id.* at 57. Counsel argued that this testimony went to the very issue of what Hayden knew about Lloyd, N.T., Trial, 4/16/18, at 8, and that Dr. Shovlin told Hayden many times about Lloyd's bizarre, paranoid and other behavior, proving Hayden and the Outdoorsman knew of the necessity to control Lloyd's behavior. *Id.* at 26. Counsel admitted—and the court quickly surmised—that he had a copy of this report at the time of Dr. Shovlin's second deposition, but he did not use it, as he was saving it for trial cross-examination. *Id.* at 7, 11. Defense counsel stated that they had not seen this exhibit until one hour

---

[31] As stated, the shootings in this case occurred on February 11, 2012.

before argument that day and that it was not produced in discovery.[32] *Id.* at 17-18. After argument, the trial court, on the record, granted the motion for a protective order, finding that the doctor was medically unable to attend trial. *Id.* at 28.

Under Rule of Civil Procedure 234.4, a court may quash a subpoena to attend trial if, after hearing, the court determines an order is necessary to protect a party, witness or other person from unreasonable annoyance, embarrassment, oppression, burden or expense. This court will "affirm a trial court's decision to quash a subpoena unless we find that the court abused its discretion or committed an error of law." *Commonwealth v. Simmons*, 719 A.2d 336, 340 (Pa. Super. 1998).

We conclude the trial court did not abuse its discretion in granting the motion for a protective order for Dr. Shovlin not to appear at trial based upon medical necessity. Foremost, we reject Appellants' claim because Appellants' argument focuses only on the loss of counsel's ability to cross-examine Dr. Shovlin at trial with the police report, and mentions nothing about the basis for the trial court's decision to excuse Dr. Shovlin based upon medical necessity. Counsel has failed to address the basis of the trial court's exercise of discretion. Appellants' counsel also cannot now complain about the loss of this witness at trial due to his own abusive and intimidating conduct during

---

[32] Counsel is under a continuing obligation under our discovery rules to promptly supplement discovery answers respecting persons having knowledge of discoverable matters and to immediately produce copies of any witness statements. *See* Pa.R.Civ.P. 4007.4, 4003.4.

the deposition that exacerbated Dr. Shovlin's medical condition, precluding him from appearing at trial. The loss of counsel's ability to cross-examine Dr. Shovlin at trial with the police report was the result of his own strategic decision not to examine the witness with this document during the deposition when the document was available to him.

We also conclude that the loss of the opportunity to cross-examine on the report did not prejudice Appellants' cases. From what we can discern from Appellants' brief, counsel believes that testimony by Dr. Shovlin—that he may have told Hayden about Lloyd's bizarre or paranoid conduct—would have provided the proof necessary to find Hayden liable for his son's actions. Assuming for the moment that Dr. Shovlin, through either direct or cross-examination, would have testified he informed Hayden of such behavior, that evidence alone would not have been enough to establish liability upon Hayden for his son's actions. To establish Hayden's liability for his son's actions, as stated, it was incumbent upon Appellants to prove that Hayden had the right to control the firearm that was in the possession of Lloyd and that Lloyd possessed the mental capacity of a feebleminded adult or that of a young child. **See Wittrien**, **supra**; Restatement (Second) of Torts § 308. Appellants' claim against Hayden fails at the outset because they did not produce any evidence that Hayden had the right to control the firearm used by Lloyd. Further, it was not possible for Appellants to sustain their burden of proof by merely establishing that Lloyd possessed violent and other

propensities, without any evidence that he was a feebleminded adult with the mental capacity commensurate with that of a young child. *Wittrien*.

## E. Evidence of Prior Bad Acts

Pretrial, Appellants filed motions in limine seeking, *inter alia*, to preclude introduction into evidence chronic drug use by the respective Decedents and evidence of any of their violent propensities, criminal records, protection from abuse orders, vehicle violations, and other bad acts. Citing *Kraus v. Taylor*, 710 A.2d 1142 (Pa. Super. 1998), the trial court denied the motion to preclude evidence of chronic drug use, finding that evidence was relevant to future loss of earnings, but granted the motion as to other prior bad acts. Trial Court Order, 4/5/18, at 3 n. 3 and n. 4. It was the trial court's conclusion that any evidence as to these prior bad acts would not be probative on the issue of the contributory negligence of either decedent, where Lloyd had no knowledge of any prior bad acts of either of them at the time of the shooting incident. *Id.*

Appellants argue that it was error for the trial court to allow defendants to cross-examine the mothers of Decedents concerning the previously excluded prior bad acts, parroting the trial court's pre-trial ruling that these prior acts were irrelevant, because Lloyd did not know Decedents before he shot them to death. Appellants, however, ignore the reason provided by the trial court as to why it permitted this previously-excluded evidence to be introduced: Appellants opened the door after introducing testimony that Decedents were upstanding individuals. Trial Court Opinion, 2/8/19, at 6 n. 7 (citing *Commonwealth v. Nypaver*, 69 A.3d 708, 717 (Pa. Super. 2013)

(a litigant opens the door to inadmissible evidence by presenting proof that creates a false impression refuted by the otherwise prohibited evidence)). As Appellants have not seen fit to address the basis upon which the trial court allowed this previously excluded evidence, we see no need to venture further into the issue. We conclude that the trial court did not abuse its discretion in admitting this prior bad acts evidence after Appellants opened the door for its introduction into evidence. ***Commonwealth v. Stallworth***, 781 A.2d 110, 117 (Pa. 2001) (admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion). Appellants obtain no relief.

## F.    The Jury Verdict Slip

Appellants in their sixth issue argue that the trial court erred in refusing to have proper questions included on the jury slip, allowing impermissible questions on the jury slip, and failing to include questions in proper order on the jury verdict slip. Appellants' brief, that purports to address this multitude of issues, spans little over two pages and provides little additional clarification on the numerous questions suggested. Appellants further contend that the trial court erred by not instructing the jury on the verdict slip that negligence and recklessness were proven because of Lloyd's conviction, and that the verdict slip did not contain questions mandated by the restatement on torts, as well as the duties of the Outdoorsman under the factual scenarios in this case. Appellants' Brief at 65-67.

We already addressed the issue of negligence. ***See*** Section A, ***supra***. We also have addressed the issue of recklessness in our discussion concluding that the jury properly considered comparative negligence, since Lloyd's conviction did not establish that he acted recklessly. ***See*** Section B, ***supra***. We refuse to, and in fact cannot, address Appellants' remaining claims regarding questions mandated by the restatement and duties owed by the Outdoorsman, and any others that might be suggested, as we deem them all waived. Appellants' violations of our appellate rules respecting issue preservation and the obligation to properly develop claims in a brief with legal authority are so blatant that extended discussion is not warranted. ***See*** Pa.R.A.P. 1925, Pa.R.A.P. 2116, Pa.R.A.P. 2117, and Pa.R.A.P. 2119. Appellants are not entitled to any relief on this sixth issue.

## G. Jury Instructions

Appellants fare no better on their seventh issue that the trial court erred in refusing to give and/or include certain jury instructions. They claim to have submitted a comprehensive list of instructions, some of which they say the trial court gave in modified form, while failing to give "quite a few of the other applicable instructions requested by [Appellants]." Appellants' Brief at 67. To be sure, Appellants claim:

> Some of these instructions include: adverse inference/spoliation; negligence *per se* in light of 18 U.S.C. § 922(g)(3)[sic]; Section 219 of Restatements and other Agency instructions; Section 231 of Restatements and/or subsection b and/or c; Section 321 of Restatements; Section 317 and/or 318 and/or 319 and/or 320 and/or 324 of Restatements and/or subsection b and/or c; Section 321 of Restatements; Section 323 of Restatements; Section 308

of Restatements . . . . The trial transcript will demonstrate other instructions that were objected to and ones that were requested by [Appellants], but were not given, all of which was objected to on the record and submitting [Appellants'] own jury instructions

Wherefore, [Appellants'] respectfully request Your Court to find that the trial court was in error regarding its handling of the jury instructions and as such remand this matter to the trial court with directions to conduct a new trial as to all Defendants and more so only in regard to damages.

*Id.* at 67-68 (internal string cite omitted).

Given our rules establishing the procedures necessary to raise and preserve exceptions to requested jury instructions, *see* Pa.R.Civ.P. 226, 227, 227.1; Pa.R.A.P. 302(b); *Jones v. Ott*, 191 A.3d 782, 791 n.13 (Pa. 2018), it is almost incomprehensible to consider the task Appellants desire this Court to engage in to identify, advocate, and address this seventh issue, not to mention the numerous rule violations in presenting their claim in this manner. Suffice it to say, Appellants waived all issues as to jury instructions. *See Commonwealth v. Beshore*, 916 A.2d 1128, 1140 (Pa. Super. 2007) (finding waiver where appellant presented no argument or citation to the record to support the argument), *appeal denied*, 982 A.2d 509 (Pa. 2008). Although Appellants provide some additional detail in their reply brief, such detail does not save claims from waiver. *See Commonwealth v. Collins*, 957 A.2d 237, 259 (Pa. 2008) (stating "[a] claim is waived if it is raised for the first time in a reply brief"). No relief is due.

## H. Denial of Motion for Directed Verdict

In their eighth issue, Appellants claim that the court erred when it did not grant their motion for directed verdict. They request that we remand this matter to the trial court with instructions that liability be admitted as to all defendants and that trial be conducted solely in reference to damages. Appellants' Brief at 68-70. Continuing in the same summary form as their issue on jury instructions, Appellants state:

> Here, a review of the record and evidence demonstrates that the law requires a verdict in Plaintiffs [sic] favor. This includes, but is not limited to: (1) Defendant VP being in the course and scope of his employment; (2) Defendant Hayden Thomas, the President of The Outdoorsman Inc., having knowledge of Defendant VP's violent propensities: (3) Defendant VP, the Vice President of The Outdoorsman Inc., using illegal drugs for the past 10 years and also on the date of the subject incident; (4) Defendant VP's mental health issues: (5) Defendant Hayden Thomas, the President of The Outdoorsman Inc., having rank and control over Defendant VP, as Vice President; (6) Defendant The Outdoorsman Inc. owning the firearm used in the subject incident and having the right and duty to control that firearm; (7) Restatement of Torts Sections 231, 317, 316, 318, 321, 322, 323, 308, 319, 320, and/or 324.

*Id.* at 69. Appellants further invite this Court to review pages from the reproduced record which they claim clearly detail the reasons, including the specific statutes and the specific cases that the trial court recited which would mandate a verdict in their favor. *Id.* They offer nothing more in their brief, devoting only approximately two pages to this issue, to support their request for relief. Once again, Appellants' complete failure to properly preserve and argue this issue constitutes waiver. No relief is due.

Nonetheless, we observe in passing, that a directed verdict may be granted only where the facts are clear and there is no room for doubt. ***Fetherolf v. Torosian***, 759 A.2d 391, 393 (Pa. Super. 2000), ***appeal denied***, 796 A.2d 983 (Pa. 2001). One would expect that arguing for a direct verdict (or JNOV) on appeal would require a detailed exposition of the trial evidence to demonstrate that no material questions exist such that the entry of a directed verdict could be made as a matter of law. That detailed exposition obviously is missing from Appellants' brief.

## I. Coordination and Consolidation of the Cases

In their final issue, Appellants claim their respective cases should not have been coordinated in Susquehanna County and should not have been consolidated.

### 1. Coordination

Appellants claim that the Rogers Estate case was properly initiated in Lackawanna County, where it had been for over three years before it was coordinated with the Alvarez Estate case, which had been filed in Susquehanna County a year after the Rogers Estate filed its case. They claim the cases should have been coordinated in Lackawanna County, rather than Susquehanna County, as Lackawanna County would have promoted economy to the litigants and the judicial system.

Appellants waived their challenge to the coordination order. Pennsylvania Rule of Appellate Procedure 311(c) allows a party in a civil action to take an interlocutory appeal as of right from an order "changing venue,

transferring the matter to another court of coordinate jurisdiction, or declining to proceed in the matter on the basis of forum *non conveniens* or analogous principles." Pa.R.A.P. 311(c). The right to an interlocutory appeal under Rule 311(c) includes appeals from orders coordinating cases pursuant to Pa.R.Civ.P. 213.1, as such an order effects a change of venue in at least one case. **See Washington v. FedEx Ground Package Sys., Inc.**, 995 A.2d 1271, 1275 n.3 (Pa. Super. 2010).[33] The failure to lodge an interlocutory appeal constitutes waiver in any subsequent appeal of any challenge "to jurisdiction over the person or over the property involved or to venue, etc." Pa.R.A.P. 311(g)(1)(ii). The order at issue here changed venue because it transferred the Rogers Estate case to Susquehanna County, and Appellants' challenge on appeal goes to venue because they claim Lackawanna County was a more appropriate forum for consolidation. Because Appellants did not file a Rule 311(c) appeal from the order coordinating the cases, they waived this issue. No relief is due.

## 2. Consolidation

Appellants lastly contend the cases should not have been consolidated because certain evidence—such as Rogers' drug use and the shotgun, the placement of the vehicle and Rogers' lack of a license—was properly

---

[33] **See also Wohlsen/Crow v. Pettinato Assoc. Contractors & Engineers, Inc.**, 666 A.2d 701, 703 (1995) ("[A]n order directing coordination of actions in different counties [pursuant to Rule 213.1] is an interlocutory order appealable as of right."); DARLINGTON, MCKEON, SCHUCKERS & BROWN, 20 West's Pa. Prac., APPELLATE PRACTICE § 311:104 (2021).

admissible in the Rogers Estate's case, but not in the Alvarez Estate's case, and was in evidence in the Alvarez case only because the cases were consolidated.

We review an order consolidating cases for an abuse of discretion or error of law. *Moore v. Ericsson, Inc.*, 7 A.3d 820, 828 (Pa. Super. 2010). Rule 213 provides:

> (a) In actions pending in a county which involve a common question of law or fact or which arise from the same transaction or occurrence, the court on its own motion or on the motion of any party may order a joint hearing or trial of any matter in issue in the actions, may order the actions consolidated, and may make orders that avoid unnecessary cost or delay.

Pa.R.Civ.P. 213(a).

Here, the trial court concluded that it "[could not] agree that any prejudice has occurred to either [Appellant] by consolidating the cases for trial. Only a very small amount of evidence differed between the two cases, and then only in the damages portion of trial." Trial Court Opinion, 2/8/19, at 9. We agree. This was not an abuse of discretion or error of law. The operative facts were the same in both cases, and no undue prejudice resulted. Accordingly, Appellants are not entitled to relief.

## IV. CONCLUSION

In sum, we first conclude that the trial court committed a harmless error when it failed to instruct the jury that Lloyd was negligent in light of the fact Appellants failed to satisfy the element of causation. The jury determined that the conduct of Decedents caused their harm, *i.e.*, death. Second, the trial

court did not err in permitting the jury to consider the issue of comparative negligence. Third, to the extent Appellants challenge the nonsuit entered in favor Hayden, they preserved for our review only the claim that sufficient evidence was presented to establish that Hayden knew Lloyd was feebleminded. In this regard, we conclude that Appellants are not entitled to review because they did not produce sufficient evidence to prove that Lloyd could possess the gun used in the shootings only with Hayden's permission or that Lloyd was under Hayden's control as a feebleminded adult suffering from a cognitive disability rendering him with a mental capacity of that of a young child. With respect to their fourth issue, challenging the trial court's grant of Dr. Shovlin's motion to quash, Appellants obtain no relief. The trial court did not abuse its discretion in granting the Motion based upon medical necessity, which was exacerbated by the conduct of Appellants' counsel at Dr. Shovlin's deposition. Fifth, the trial court did not abuse its discretion in admitting prior bad acts evidence after Appellants opened the door for such evidence by introducing testimony that Decedents were upstanding individuals. We decline to address the merits of Appellants' sixth, seventh and eighth issues, because Appellants failed to preserve them for our review. As a result, the issues are waived. Finally, Appellants are not entitled to relief on their claim that the trial court erred in coordinating these cases because they did not timely file an interlocutory appeal under Rule 311(c). Thus, this issue is waived. Relatedly, Appellants' claim that their respective cases should not have been consolidated also lacks merit. The operative facts in both cases were the same and no

undue prejudice resulted. Accordingly, the trial court did not abuse its discretion. We, therefore, affirm the trial court's November 21, 2018 judgment in favor of Appellees and against Appellants.

Judgment affirmed.[34] Application to strike denied. Application to expand word limited granted. Jurisdiction relinquished.

President Judge Panella, President Judge Emeritus Bender, Judge Bowes, Judge Olson, Judge Nichols, Judge King, and Judge McCaffery join the Opinion.

Judge Kunselman files a Concurring Opinion.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 03/02/2023

---

[34] Appellees filled an application to strike Appellants' reply brief to which Appellants filed an answer and an application to expand the word limit. We deny the application to strike and grant the application to expand the word limit.